## Case No. 13,009.

### SMITH v. BABCOCK et al.

[2 Woodb. & M. 246.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1846.

EQUITY — RESCISSION OF SALE — FRAUD — PARTY BENEFITTED — BANKRUPTCY — LACHES.

1. In a proceeding in equity to set aside a sale of land for fraud, the person who was most benefitted by the sale is in a situation to be suspected of it, if a fraud was actually committed.

2. If such a person makes statements as to material matters connected with the value of the land, and which, from being more within his private knowledge, or other circumstances, were clearly relied on in the purchase, and they turn out to be false, the sale is void, whether he believes them to be true or not.

[Cited in Clark v. Manufacturers' Ins. Co., Case No. 2,829; Iowa Economic Heater Co. v. American Economic Heater Co., 32 Fed. 737.]

[Cited in Converse v. Blumrich, 14 Mich. 123; Newton v. Tolles (N. H.) 19 Atl. 1093.]

3. It is no objection to rescinding such a contract, that another remedy or a guaranty may exist against that person alone, now become insolvent, but not against the other respondents, and particularly if fraud be the ground assigned for rescinding; or that the complainant had an opportunity to examine the land, and one of his friends did examine it some time before the bargain was completed, if the false representations of the person, making the sale, were relied on as to details, and others hired by him, unknown to the examiner, were uniting in statements and acts likely to mislead; and more especially if the misrepresentations extended also to other matters than the timber on the land which were material, and were not attempted nor offered to be examined.

[Cited in Mason v. Crosby, Case No. 9,234; Perry Manuf'g Co. v. Brown, Id. 11,015.]

4. A bill charging falsehood and fraud in a sale, as to the exaggerated quantity of timber on land, may contain enough to justify setting the sale aside for a gross mistake in the quantity, without setting up the latter as a specific and separate cause: but it is better to have such cause stated independently, in order to give clearer notice to the respondents, of what is to be contested.

---

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

5. Where such person owned in common with others an undivided share of the land, and the whole title of it had been vested in two of the number in trust for the rest, and those two had agreed to sell to him the whole, at a given price, and he had failed to make payment at the time agreed, or to tender it, the whole title was not in him. And if they agree to allow him further time, and he sells for more, receiving the excess for himself, and those two then convey to him, he having conveyed to the purchasers, and receive the consideration agreed from the purchasers through him before delivering the deeds, he is to be regarded as their agent. If they took the proceeds and benefits of the sale, they must aid him to refund the consideration which they received.

6. More especially is this the case when some of the owners in common, beside the person negotiating the sale, united in the false representations and attempts to mislead, by making similar exaggerated statements as to the timber, and in forming another company, in which they were part proprietors, to purchase of themselves at a still higher rate per acre, than he was to give. This person was to be the agent to sell for that company, and at the same time was represented as the vendor to them after buying of the trustees, though, in fact, he never had a conveyance from the trustees, nor made one to the other company.

7. Where this person, so negotiating the sale to the complainant, keeps a part of the notes given for the consideration, and assigns them to a creditor of his as collateral security for a previous debt, or for a debt partly new, but not in payment or satisfaction of it, the note is open to any defence which was good against it in his hands.

[Cited in Bowman v. Van Kuren, 29 Wis. 218.]

8. More clearly is this the case, where the creditor had notice of the consideration of the note, and probably had information of the exaggerations and misrepresentations practised.

9 A plea in bankruptcy is not to be sustained against a claim in equity to rescind a contract like this on the ground of fraud.

10. A delay of two years after the completion of a sale alleged to have been fraudulent, and of one year after the discovery of the fraud, was *held* not to bar a suit for a rescission of the sale.

[Cited in Upham v. Brooks, Case No. 16,797; Stillman v. White Rock Manuf'g Co., Id. 13.446.]

[Cited in Gatling v. Newell, 9 Ind. 586.]

This was a bill in equity, entered as long ago as January, 1839. [At that time an application was made by Joseph Noble for leave to file an amended answer upon certain circumstances. The motion was allowed. Case No. 13,008.] The defendants were fourteen in number, viz: Samuel H. Babcock, John B. Glover, Josiah Daniels, Increase S. Withington, Joseph Leeds, Benjamin Leeds, Paul Whitney, Levi B. Haskell, Jos. F. Leach, Osgood P. McLellan, William H. Montague, George L. Montague, John B. Cross, and Joseph Noble. The bill prayed a re-payment of certain money, given by the complainant to Cross, and by him divided between himself and the different respondents, except Noble; it having been received from Smith in part payment of one fifteenth of a tract of land, called township ——, A. No. 2. in Oxford county, in Maine. This

portion of that township, Cross on the 9th of November, 1835, conveyed by deed to [William S.] Smith [Jr.], and it had been before owned by the respondents in certain proportions, hereafter to be explained. The bill prayed also for a return of certain notes, then executed by the complainant to Cross towards the consideration of that conveyance, and which it was averred were now in the hands of Noble, with notice of their consideration, as collateral security, to indemnify him for certain liabilities on account of Cross. The principal charge in the bill was, that in the sale, made in certain shares to the plaintiff and five others (consisting of five thirtieths to Joshua Fanning, five thirtieths to George Miller, two thirtieths to Nathaniel Tuthill, Jr., one thirtieth to Nathaniel Miller, and two thirtieths to Smith), there were fraud, misrepresentation and falsehood, on the part of Cross, in several material particulars, which were relied on by the plaintiff in the purchase; and that the conveyance ought, therefore, to be set aside, and the consideration restored. It further averred, that Cross was chiefly instrumental in making these misrepresentations, as agent and part owner with the other respondents, except Noble; and that those others, as principals and part owners, having received the money paid on account of the sale of their interests in the land, were bound to refund the money; and that Noble, as holder of Smith's notes given for the land, with full notice of their consideration, and only as collateral security, could not recover their amount, and ought to return them to the plaintiff.

The brief history of the other parts of the transaction, as set out in the bill, was as follows. Some time previous to the 1st of June, 1835, this township was owned by William Reed. On or about that day, Cross having become possessed of Reed's bond, given for a deed on certain terms specified, took a conveyance from him of the township, and, to secure part of the payment, executed a bond to Reed for the payment of $24,000 in money, in which E. Wyer was his surety. On the 25th of June, 1835, Cross, in pursuance of a previous agreement, executed a deed of the same township for $3.50 per acre to Babcock and Glover, or the survivor of them, who are two of the defendants, and who gave a writing of the same date to others who had united with them in the purchase; showing that the land was held in trust by Babcock and Glover for those owning the ten shares, into which it had been divided, each of the defendants but Noble owning one, except that the two Montagues as a firm, and Leach & McLellan as a firm, and Whitney & Haskell as a firm, owned but one share to each firm. The owners of these shares constituted what is called the First Boston Company, and for whom Babcock and Glover were trustees, to manage and sell the property, and account for any in-

come or proceeds, equally among the share holders. The bill then alleged, that with a view to dispose of this township at a high price, and mislead those who might purchase as to its true value, the First Boston Company soon afterwards commenced a system of deceptions and misrepresentations as to the title and sales of the land, and the quantity of timber thereon, and the facilities of getting it to market, till eventually, in November of that year, as before specified, the plaintiff made the purchase of one fifteenth of it at six dollars per acre, when its true value was not one sixth of that sum; and he was induced to over-estimate it to that extent by gross frauds and falsehoods. Among the means used to accomplish the imposition, it was averred, that a second Boston company was got up to buy this township of Cross, the then supposed owner of the whole; that it was to be divided into thirty shares, and six dollars per acre given therefor, and Cross, if desired, was to guarantee one hundred and thirty millions feet of good pine timber on it per acre; that Babcock first signed this undertaking, and for three thirtieths. Whitney & Haskell next for two thirtieths, and Benjamin Leeds for one thirtieth—all members of the first company—and thus others were soon induced to subscribe for the remaining shares; and afterwards, August 10, 1835, that they executed a written indenture to Cross, reciting that the land had been bought by them of him, at six dollars per acre, and that he might sell the same for seven dollars per acre, and retain all he obtained over that sum. On the 15th of August, 1835, a bond was executed also by Babcock and Glover to Cross, to convey the land to him at five dollars per acre, on or before the 17th of October; and another bond by him to them, that he would pay or secure to them this price by that day. Previous to this, and as early as June 27, 1835, certificates had been obtained from several persons, that on a careful examination of the township, there were one hundred and thirty millions feet of good pine timber on it, and a good stream for getting the logs to market the first year; and other certificates were given still earlier, in March, 1835, stating the quantity of good pine timber to be at least seventy or eighty millions of feet.

It is then averred that Cross started about the 20th of August with these papers for New York, and there, through one Alexander Chalmers, a former partner of his, whom it was stated he hired, at large commissions on all the land sold, to aid him in disposing of it, was introduced to George Miller, one of these five subsequent purchasers. Not effecting a sale there at nine dollars per acre, the price asked, he left and returned again the first week in October, when Tuthill, one of the purchasers, before finishing the bargain, concluded to visit the county of Oxford, and make some examina-

tion of the title or the records, and the locality and value of the township. Cross in the mean time, on the 17th of October, made no payment to the First Boston Company under his bond, and became liable for its amount; conveyed a large portion of his property, on the 22d of that month, to Noble, including the notes of some of the First Boston Company for their original purchase of him, doing this for security and indemnity to Noble; and having found most of the second company unwilling to settle with him and take conveyances of the land, though three of them, Babcock, Jenkins, and Cordis, if no more, had given bonds to do it. But Cordis had become satisfied that the pine timber on the land was much less than Cross represented, and hence refused to take it, and gave notice to other new members, as well as to Cross, of his refusal and the grounds for it.

In consequence of some conversation with Tuthill, indicating that he might purchase the land at a lower price than nine dollars per acre, Cross once more in November visited Long Island in company with G. Montague, one of the First Boston Company. The latter carried with him deeds of the township in different shares, of one tenth each, from Glover and Babcock to Cross, with instructions not to deliver them till receiving money or satisfactory notes, at five dollars per acre therefor. After Cross had made the sales in New York to the plaintiff and others, of twenty-six thirtieths of the whole township, he returned to Boston and settled with the First Boston Company, for the amount, by money and notes of the purchasers, indorsed by him to the first company, and delivered to Noble the plaintiff's notes to the amount of about $28,520 for security and indemnity, as before recited. He offered various guarantees, is was averred, in New York and elsewhere, to purchasers, as to the quantity of pine timber on the land, being one hundred and thirty millions feet per acre, and represented himself as a man of large property, and abundantly able to fulfil such guarantees. To the plaintiff he gave a bond to take back the land again in two years, and pay him his consideration and ten per cent. interest, if he was dissatisfied; and another bond to him and others, to pay them a large sum if he, as their agent, did not in five years get off the land lumber enough to pay all they had given, and twenty-five per cent. interest thereon. Among the false representations alleged to have been made by Cross to the plaintiff and his associates, were these: That he was the owner of the township; that he was a person of large estate, able to respond to all his guarantees and bonds; and that the land had one hundred and thirty millions feet of good pine timber per acre on it, and a stream suitable to transport it yearly to market.

The bill was amended from time to time, and various exceptions made to the answers; but the substance of the allegations in the bill,

not given above, are, so far as material, referred to in the opinion of the court.

The answers, after several amendments and supplements, are divided chiefly into three classes. Those by the First Boston Company, except Cross, are mostly alike; then come his separately, and then Noble. The first respondents deny the allegations charging fraud, or concealment, or misrepresentation, and virtually admit such deeds and papers as are set out in the bill. They also deny any agency of Cross to sell the land in their behalf; and aver that the certificates were honestly obtained, and were believed to be true. The answer of Cross also denies all fraud, and in other respects generally, as above named, accords with the rest; but goes further, and avers himself, at the time of his guarantees referred to in the bill, to have been a man of large estate, and was so considered by himself and others as early as July, 1835, and as late as the time of his answers in 1837 and 1839. The answer of Noble either denied or expressed ignorance of other matters, except the transfer of the note of Smith to himself by Cross; and alleged, that it was given to secure him against certain liabilities for Cross by him and Wyer, existing before the large assignment in October, and instead of some of the notes then assigned, which were returned to Cross in November, and for indemnity on account of some new liabilities then assumed. And he further averred, that the assignment in October was to secure only debts and responsibilities then existing, or afterwards to be renewed, within four years.

Some other matters in the different answers are noticed in the opinion, wherever important, as are also such portions of the testimony on both sides as are deemed competent and material, the whole being too voluminous for recital. This case was argued before Mr. Justice Story for some days in 1844, but left unfinished and never resumed till since his death. It came on for hearing again at the adjourned term of this court in April last, and was then argued at some length, and concluded at the May term, 1846, after occupying in all most of sixteen days.

Mr. Bosworth, of New York, and R. Fletcher, for plaintiff.

Mr. Cooley, J. P. Rogers, C. G. Loring, and Mr. Choate, for different defendants.

WOODBURY, Circuit Justice. The lapse of time since the proceedings in this case commenced has been such, that the members of the court are neither of them the same. Most of the counsel are also new, and the condition of all the respondents, with a single exception, has changed, it is said; and several, from what was supposed to be splendid affluence to bankruptcy, and one of them passed "that bourne whence no traveller returns." Where the fault has been for such unusual delay, or whether there has been none but mere casualties and postponements, growing out of the great number of parties and counsel, and the complexity as well as magnitude of the case, I shall not attempt to settle. But my best efforts have been made to prevent any further postponement, not indispensable to a due hearing and examination of the cause; and I shall now proceed to deliver a final opinion on the questions necessary to be decided, with a desire to put both sides in possession of the reasons on which it is founded, rather than with the vain expectation of rendering it satisfactory to both.

Various questions have been raised as to the competency of some portions of the testimony and the sufficiency of other parts, which may be first disposed of by a single general remark. Without giving in detail my decision in each case, it may be taken for granted, where I rely on a piece of evidence, and refer to it in support of a conclusion of fact, it is deemed competent; and where a fact has been denied by the answers in particulars responsive to the bill, it is not considered as sustained by sufficient proof, unless it be by more than the testimony of one witness. It may be added further in the outset, that I discover no delay in the institution of the proceedings by the complainant, which should be regarded as a bar to his recovery on the merits, if merits exist; and which can, therefore, be interposed to excuse this court from the labor and responsibility of examining the rights of the different parties on those merits. Warner v. Daniels [Case No. 17,181]; Mason v. Crosby [Id. 9,234]. The proceedings were begun in less than two years after the purchase of the land by the plaintiff, and in little more than one year after the deficiency in the timber was ascertained to be great, and after the conduct of the respondents was believed to have been unfair and illegal. Nor is there understood to have been any alteration in the property or title since the sale, which is sufficient to disable the plaintiff from making a valid re-conveyance of his share, if it should otherwise appear just to rescind the sale; though it is stated in evidence that some auctions of the land for taxes have since taken place. But redemptions are understood to have been made before the title was foreclosed; and though some timber was got off by the plaintiff and others the first winter, it is supposed to be not so much as sensibly to change the value and condition of the premises.

Proceeding then to the great points in controversy, as the interests and liabilities of the respondents are in some respects different, I shall first consider those of Cross, the most active and conspicuous participator in the transaction; next, those of the rest of the First Boston Company; and, lastly, those of Noble.

It is clear, that the respondent, Cross, was the sole owner of the whole township in dispute, about the 1st of June, 1835. It is equally clear, that in all the subsequent transfers of it, as well as in all the contracts and arrangements for sales, whether defeated or perfected,

and in all the representations connected with them, whether true or false, and in all the certificates obtained as to the timber, and which are conceded now to be so erroneous, he was the chief actor, and probably more deeply interested than any other individual. For if the whole land cost him only about $30,000, which is the price that was to be paid to Reed, according to his testimony, though Cross testifies to near $20,000 more in various ways; and if Cross obtained for it about $70,000 beyond this $30,000 from the First Boston Company, and next received in New York near $30,000 more than he was to pay to the First Boston Company, and something like $5,000 more net profits on his one tenth reserved in his original deed, and invested in that company, he would, supposing all the payments to be honestly made, have realized, in only this one township, in about six months, the enormous profits of near $105,000; while all the other persons united, so far as is known here, could not have profited in this same operation half that amount, and no one person over one twentieth as much. It will be seen, then, at a glance, how great was his interest or inducement to effect these various sales, and how strong were his motives to press on purchasers such considerations, as should be likely to throw within his grasp in so short a time, and in an operation as to a single tract of land, such a brilliant fortune. Cross being thus situated, as the great gainer by these sales, was therefore in a condition to be tempted into misrepresentations in order to effect them. But having stronger motives that any others to do wrong, is only one step in the inquiry as to his real conduct; and the next is what representations, if any, did he actually make concerning the township, which were in fact erroneous, and likely to deceive the plaintiff?

The first specific examination concerning Cross's course, in respect to these sales, may as well be in relation to the representations about the quantity of pine timber on the township. What kind of statements on that subject did he actually make to the plaintiff and others, about the same period, and connected with the sale of this land, so as to render them competent evidence? See cases in Warner v. Daniels [supra], showing when they are competent. Next, were they relied on by the plaintiff? and were they false? The case is full of proof, that he made statements as to the quantity of good pine being one hundred and thirty millions feet per acre, not only at Boston and Hopkinton, in writing and orally, by guarantee separately and in bonds, but at Long Island and to this plaintiff, with the other purchasers. That they were relied on, also, is proved by the fact, that the land was purchased with the view of paying the interest and part of the principal speedily, by sales of the timber; that Cross gave a guarantee of twenty-five per cent. profits from it by such sales; that even before leaving New York he was constituted their agent, to go at once on the land and begin the removal of the timber,

to realize these great profits from it; that he gave written guarantees of the quantity, and computations showing how some $43,200 per share could be made by the purchasers of this timber.

It is an objection not well sustained, which his counsel have urged against setting up such representations as fraudulent, that another remedy existed on those guarantees. It is a novel doctrine, that a written warranty is a bar to a suit or defense founded on fraud in the same transaction; and the cases are not only numerous, that fraud vitiates all contracts tainted by it, but that it may be set up in contests as to the consideration of the sales, whether a warranty existed or not. Semble Schwartz v. United States Ins. Co. [Case No. 12,505]; 1 Day, 156–158; 4 Mass. 491, 492; 4 Durn. & E. [4 Term R.] 67, 337; 6 Johns. 110, 181; 1 Johns. 414, 503; 2 Wooddeson, 416; 7 Mass. 68. If such an objection was urged in another view, as furnishing an ample remedy at law (and hence that none in equity exists here, under the judiciary act of 1789), the conclusive answer to it is this: The other remedy is only against one of the respondents instead of all, and that one entirely insolvent.

All that remains on this point is, to decide whether these representations were in reality true or false. Perhaps there is no better general test of this, than the failure of Cross to fulfil his various guarantees concerning them, during the four or five years after, when the plaintiff and others contended that they had turned out to be false, and while Cross was not only under guarantees to make them good, but swears that he had ample means for any such purposes; though since become insolvent. If they were true, it would have been no loss, but a gain for him to take back the land; or if doubtful, it was honest and honorable to exhibit new evidence of their truth, or, with his professed ample means, to make good the indemnity he had given. On the contrary, if they were neither true nor colorably so, but undeniably groundless, and made, not in ignorance, but with intent to mislead, the course of conduct was likely to have been pursued which has been charged in the bill as exhibited on the present occasion. Firstly, buying Reed's bond, who estimated the good pine at only twenty-five millions, then getting a set of certificates which were made in March for seventy or eighty millions, and then in three months, when new sales at a higher price were contemplated, obtaining a new set of certificates for one hundred and thirty millions, increasing like the rolling snow ball; and whether obtained in some degree by presents or "gratification money," or by inexperience and looseness of morals in certifying, it is not necessary to settle on the evidence as to those points; but only that they were obtained and used, and were in truth great exaggerations. Again, when the correctness of the statements as to this large

quantity of timber was questioned by Cordis, certainly as early as October, if not September, and the grounds of it stated to Cross; and when in consequence of it, in part at least, the Second Boston Company was broken up; it is in symmetry with this previous suspicious behavior of his, not to have the land more carefully re-examined, and not to be more cautious and measured in his future statements as to the quantity, but still continue to represent it as high or higher than the last inflated certificates. And so, when letters were written to New York from Maine, repeating this charge of deception against him, he refrained from taking any new steps to disprove it, as incorrect. So, when at Long Island, new and more careful explorations instead of these were proposed to him, not being willing to make them, but objecting to the loss of time from them, and offering his guarantee as to the quantity, with assurances of his great wealth and responsibility to meet it.

Lastly, when those who had been thus misled complained in 1836, it is in perfect keeping with the same hypothesis, that the certificates were false, if not so known to be, that he should not attempt to fulfil his guarantee, though professing in his answer to have been amply able, but recommended "Christian resignation," and proceeded at once to foreclose his mortgages. If satisfied that a great error had occurred inadvertently, why did he not procure and return the notes, and honorably rescind the sale, when his ability at that time, though pledging the notes to Noble for certain specified liabilities, is sworn by both him and Noble to have been great, and to have rested on much other property not pledged, as well as that pledged. But the closing survey of the timber, made under an arrangement between the purchasers, and some of the holders, to give up their notes to the amount or extent the quantity of pine timber should prove to be less than eighty millions of feet, shows beyond question how the actual truth was in respect to the representations of there being one hundred and thirty millions. The whole quantity was in fact found not to have exceeded eight millions, not one sixteenth of the quantity represented and guaranteed; and two of the very certifiers in March, 1835, Russell and Paine, when under oath, testify to this reduced quantity of eight or ten millions as the truth in March, 1835, instead of the eighty millions, to which they then certified, and instead of the one hundred and thirty millions which Russell was the pilot to point out to the certifiers in June, 1835. How fully does this indicate what was to be inferred from Reed's own knowledge and belief, for some time an owner and explorer of this township, that the quantity of good pine timber was then known not to exceed twenty-five millions? And how fully could any one possessed of that knowledge, like Cross in all probability, have been satisfied that certificates swelling the quantity several hundred fold most be deceptive, and founded in ignorance or fraud? and that the land, if possessing such an increased quantity, would never have been sold to him by Reed at a dollar per acre, or even two dollars, and that he himself, or the Boston Company, with such an increased quantity really on it, ought not to sell it at even six dollars per acre?

Whether the exaggeration and falsity of these representations and certificates were known at the time or not by Cross, is not material in a civil suit, however otherwise it may be in a criminal one. See Doggett v. Emerson [Case No. 3,962]. But, to show the probability of his knowledge, connected with his representations, and the fact of their falsity, it is apparent that still more evidence could have been furnished if deemed necessary. The bond of Reed distinctly appears to have been in the market for this land before January, 1835, and in the hands of some person in Bangor. It would have had a very material and additional influence on this point, if this township, as seems probable, had in fact been fully explored before he bought it, and the quantity of timber ascertained to be less, or at all events no larger than Reed had supposed. As the proof is, it certainly was surveyed from Bangor before January, 1835; and the result as to the timber seems to have been such as to defeat any permanent purchase of the township there. And this was probably done by Haynes, judging from Cross's own answer to Tuthill's bill. That Cross knew this result before his purchase is not improbable, though the evidence of it is inferential. Certainly he knew it through Cordis in September, who had obtained it at Bangor from Moulton, and made it the ground with Cross against completing a purchase of a share in the town from him, and was thus fully in possession of the facts when he made the exaggerated statements to the plaintiff in October and November after. Before that, also, from Reed's evidence as to Cross's frequent inquiries of him about the quantity of timber on the land, Cross probably must have known that Reed did not, though once the owner, compute the quantity higher than twenty-five millions. Probably, then, through the whole sales Cross knew that the survey by Morse and Stone was not only a great exaggeration of the true quantity of pine timber on the land, when calling it seventy or eighty millions feet per acre, but the survey in June, calling it one hundred and thirty millions, was a still greater departure from the facts. He had assuredly enjoyed ample means to know the incorrectness of both of them. But if this survey under Morse and Stone, was believed by Cross to be only as high as the truth, and nothing then existing is known which should suggest any motive for its being too low; but, on the contrary, Moulton's communications, founded probably on some other prior examination, or facts connected with this, in-

dicate a knowledge at Bangor that these were too high, the inquiry arises, how could Cross honestly suppose that the statements made to the First Boston Company by himself and the second lot of surveyors, in June, 1835, nearly doubling this quantity of good pine, were unexaggerated and true? But much more, how could he in November, after told by Cordis in September of Moulton's representations, if not known before, honestly repeat his exaggerations and guarantees? Either the first surveyors were incompetent and unfaithful, or the last ones were so; and the certificates of both could not properly be used longer as trustworthy. Or if it be said, that he confided in the first ones, and not in the last, then the last should not have been exhibited, and the inflamed quantity set out in them should not have been reiterated by him as less even than the truth about the quantity, and the correctness of it guaranteed by him over and over again in writing, as well as verbally. But enough as to the timber.

The next important representation, connected with the sale, and especially with the confidence placed in the statements and guarantees of Cross, as to the quantity of pine timber, related to his wealth. As that was asserted and believed by others to be great, or otherwise, his guarantee as to the quantity of timber, and also as to the profits to be made from it, would be more or less confided in, and more or less induce a stranger to buy. Had Cross represented himself to be poor, who believes that his guarantee would have had the influence on the purchase by the plaintiff which it probably had, when coming from a man stated to be so very wealthy? So the prior purchase of the land back by Cross from the first company, at an enhanced price over what they gave for it, if made by a man of property, able and likely to pay, and not by a needy speculator, careless whether he ever paid or not, if he could only obtain the title to sell to others, was an important element to influence the plaintiff and other buyers. What others, possessing fortune and responsibility, had done at five dollars per acre, there could be less risk in doing at six dollars, than if it had been done by those who were irresponsible and never likely to pay, unless able to sell again at as high a price. The importance and influence of his wealth on purchasers in trusting to his guarantees, and to the risk he had run in buying at such high prices as a man of fortune, are thus very manifest. That he made representations of his great wealth to the plaintiff and others, and in almost all forms, is not only proved again and again, but attempted to be shown by himself and some witnesses to have been well founded. Without going into all the details of evidence, as to the truth or falsehood of his assertions to the plaintiff and others, concerning his great wealth at that time, it is certain that he has since taken the benefit of the bankrupt law, and disclosed, in his petition and schedule, rather

a meagre account of property compared with the debts he owed. It is equally certain that no particular losses are shown to have been sustained by him since 1835, unless it be by the Long Island notes; and most of that must, as yet, have fallen on others. Much less are many specific losses shown, since 1837 and 1839, when his last answers were filed, and when he still seemed unwilling to be regarded as insolvent. It is evident, too, that the depreciation in his property since 1838 and 1839 is not likely to be much, though it may have been more since 1835. But, even in 1835, the idea of his great wealth seems to have rested much more on a mere reputation to that effect, than on any substantial and particular data, sworn to by witnesses. If his own testimony, however, were competent, the case, on its face, in its general aspect, might appear to be one, showing his fortune then to exceed $290,000. Indeed, even after his conveyances to Noble, he represents himself as retaining "much property," being, as estimated by him in another place, over $130,000; and that he has since paid "many thousand dollars."

But the proof as to this, when coming to particulars, is very meagre, except his own testimony. That he had, even in October, 1835, much estate of solid and real value, except what was then conveyed to Noble, and especially much after paying his debts, is very questionable from various circumstances, some of which it may be here proper to advert to. They are, that the conveyance then was made on the eve of a threatened suit by the First Boston Company; that it contained a long list of both real and personal estate; that it extended down to his carriage and horses, if not to every thing which was exposed to attachment; that it seemed on its face, so far as any writing is put in the case, to contain another proof of its being a general conveyance by an insolvent, as it extended so as to cover subsequent liabilities for four years; that one of his creditors soon after sued him, and recovered a judgment which he was unable to satisfy; that others had contests concerning the title of a part of the property he conveyed to Noble; that the only notes he is shown to have procured since the conveyance, have been likewise transferred to Noble under like pledges; and that from his own answer, and more especially his deposition, giving an estimate of the value of his property and the amount of his debts, so as to render him then worth a balance of nearly $150,000 by one, and $290,241 by the other, it is quite evident that the property, not assigned to Noble, was chiefly of a "fancy character." It consisted, among other things, of shares in the Maine "Mining Company," "United States' Quarrying Association," and "Hollis Granite Company;" beside, some lands in various places, and among the rest in "Shelburne, N. H.," "inclusive of minerals," and for which little probably was given, or could soon, if ever, be expected. These are valued

by him at sixty or seventy thousand dollars, and including what was assigned to Noble, there are beside, in all his estate, as Cross estimated it, some $200,000 of other lands, and $99,504 in notes and other obligations; making the great aggregate of $390,241. The debts owing are put at only $100,000. But what has been done with these effects, except those assigned to Noble, or what was their real value, does not appear, as he gives no exact list of sales or collections, and they are not contained in the schedule of his effects as a bankrupt. His deposition, furnishing the chief specific data concerning them, is confined, in that respect, to 1835. Some of these will soon be referred to for another purpose, and others are particularized in the eighth page of the testimony taken as to document C, and exhibit, among other alleged and extraordinary reservations, when conveying to Noble, about $5,000 in money, and this at the very time Winslow was attempting, without success, to collect from him less than $1,000.

Again, taking the property which is in his conveyance to Noble, and putting the value on it which Noble would seem to, and making the deductions made by him for incumbrances, and then making a like pro rata reduction on Cross's estimates of other property, where he is as likely to run into excesses as in that with Noble; and it is manifest, even on his deposition if admitted, that he was a bankrupt in 1835, not having means enough, if thus estimated, to pay all he concedes that he then owed. He seems to forget that the debts he owed were sure to be exacted without reduction, while the claims due to himself were subject to great losses and risks, and the property he owned was of such a character, that no reliance could be placed on anything beyond its cost, and not always that, until it was actually sold, and the consideration realized in money. Thus, as one illustration. Of the lands assigned to Noble, the latter seems to value one portion of them at about $24,000, after deducting the mortgages on them; while Cross, after a like deduction, values them at $150,000. This is an overestimate by Cross in these lands alone of $126,000. Supposing a like over-estimate in all his property, and the true value of the whole was but $56,000, while his admitted debts were $100,000. Again, Cross computes all he assigned to Noble, both real estate and notes, at about $203,000; but all which Noble has realized from it, is stated to be only $13,500, or not one sixteenth. His whole property, on that scale of depreciation, would be worth only $22,000, or not enough to discharge his debts into $78,000. Again, Noble swears that all the signers of the notes assigned to him in the first instance, except two firms, have failed; that set-offs existed against many of them; that none were secured by mortgages; and that half of the debt of these two firms was doubtful. From this it can readily be computed how little his notes, as well as other property, was likely

to accomplish in paying $100,000 of debts, most of which in the end, as was to be expected, seem to have been spunged out by the bankrupt law.

Another striking evidence of Cross's own opinion, being entirely unsettled as to the value of his property to the extent of over $100,000, is, that in his deposition he computes his wealth to be from $100,000 to $150,000 (varying as doubtful quite $50,000), while in his bill of particulars annexed he computes himself worth $290,241, after paying all debts, or nearly $200,000 more than the first sum of $100,000. There is another similar illustration of his habit in over-estimating his property, tested by himself, and near the time of this transaction, before any depreciation could have occurred. Thus he computes the Dorchester property at $7,000, when he sold it to Noble for only $1,200, a depreciation of near five sixths. Such a fortune, like the Indian philosophy of the earth resting on an elephant, and the elephant on a tortoise, but nothing for the tortoise to stand on, falls with the first adverse gale. So it happened, and was verified by Cross himself, in relation to the sales and the net profits anticipated, of more than $100,000 from this very tract of land now in controversy. Instead of realizing that princely fortune, the very first purchase-money to Reed of the small sum of $30,000, according to the proof, has never yet been paid, except a few thousand dollars otherwise raised. The paying of that, depended mainly on the paying by the First Boston Company to Cross; and their paying, depended on Cross's purchase back and paying them; and his paying them, depended on the paying of the First Boston Company or somebody else to them; and the paying by the Second Boston Company or others, depended on the sale and paying to them by purchasers in Long Island or elsewhere; and theirs, on the paying to them by the purchasers of "the good pumpkin white pine timber" at one hundred and thirty millions feet, yielding over a million dollars in profit, when in fact only seven or eight millions grew on the whole township, and with a bad stream to get it to market. This foundation of the whole failing, the entire cobhouse tumbled down, with fragments rolling and scattered in all directions, but not a single payment perfected from first to last.

I refrain from spending time on the evidence as to Cross's efforts to create, through the newspapers and otherwise, in advance of the attempts in August to make these sales, exaggerated notions as to his great wealth and philanthropy. It is certain, that when in that month he gave his bond to the first company, though it was intended as he says for a purchase, they were not willing to trust him as a man of property, nor did they even confide in his notes secured by a mortgage. So, again, whether he was intending to dupe others, or really duped himself on this topic, till the 22d of October, 1835, it is impossible,

after the failure which happened then to meet his engagements with the First Boston Company, and after the Second Boston Company had refused to buy of him the same land, assigning to him a deceit as to the quantity of timber as a cause, and after he had become conscious, as stated in his answers, that Eastern lands were growing duller of sale and falling in the market, and after he had felt obliged to make so large and sweeping a conveyance of his property to Noble, it is almost impossible to suppose that the delusion could continue of its being likely to turn out very rich. Certainly not, unless in the madness of the times, not entirely over in some places, he could be able to dispose of this township in some way so as to realize more for it than he had engaged to give the First Boston Company. It is very significant that Noble, who knew Cross's means best and his character fully, and was less likely, therefore, than others to confide in mere reputation, or in newspaper puffs, treated him throughout very much as mankind in general do debtors, whom they consider insolvent. His earnest inquiries of Cordis as to any payments he intended to make to Noble, his procurement of security on the 22d of October of almost the whole of Cross's property shown to be attachable, and to possess much real value, even down to his horses and carriage; his obtaining also all the new notes belonging to Cross connected with the Long Island purchase, almost immediately after his return, and extending to near $30,000 in amount—all indicate that his practical course, whatever may have been his theoretical conjectures, was precisely that of a shrewd man towards one believed by him to be of questionable responsibility. And when it soon became apparent, that all Cross's assignments to him were likely to yield much less than his just claims, and that these notes were to be contested, it seems inconceivable, if he too then deemed Cross really retaining much valuable property, and able to secure any of his creditors (as his answer and Cross's both hold out), that he should not have asked for more of it to be placed in his hands, considering the confidential and friendly relations that existed between them; and considering the very large liabilities he and his partner Wyer were under on account of Cross, amounting, as he says, to near $80,000. Indeed, in his answer in Tuthill's Case, he says he could not in October, 1835, have realized by a sale over half the nominal amount of all his securities by notes, and that since, as before remarked, every signer of them has failed, except two persons, and half the small claim against them is doubtful; that set-offs existed against many of the rest, and none were secured by mortgages, or sureties. Could something more and trustworthy as security have been got, and his demands against Cross were genuine, is it probable he would not have obtained it, when his existing securities were proving to be so worthless, and he had been so anxious even in October to be made safe?

The next misrepresentation, set up as made by Cross in August, October, and before the sale in November is, that he owned the whole township A No. 2, having repurchased it of the First Boston Company at an advanced price, and from a conviction of its superior qualities. Clearly from the evidence, such a statement seems to have been made in August, during the negotiations as well as at the time of the negotiation in October, and the sale in November. Indeed, it is quasi admitted, being justified as true on the ground, that having obtained a bond for a deed in August, and given a bond to take and pay for one on the 19th of October, he was virtually the owner till that date; and that though he then failed to obtain a deed from his inability to make the promised payments, yet he obtained a parol extension of the time for having the deed and for making payment, thirty days longer. However such a contract for a purchase may in law or equity confer certain rights to the land, which may be sustained on making, subsequently, the payments stipulated (1 Sugd. Vend. 171; 1 Atk. 572; 7 Ves. Jr. 265, 274), yet it is difficult to see how they amount to an actual sale till the condition precedent is fulfilled; and which usually is the payment or tender of the consideration.

As between the parties where there is a contract to sell and buy, chancery, by considering that done, which ought to be done, may regard the buyer as owner, and if he is to mortgage back, as mortgagor: Longworth v. Taylor [Case No. 8,490]. This must be, however, only between them and not third persons, and even a court of equity could not consider a deed as executed, unless the consideration was paid or secured. So what is to be conveyed is regarded as personalty, if the vendor die before conveying. 7 Ves. Jr. 436; McKay v. Carrington [Case No. 8,841]. Here, too, not a dollar of the money was tendered or paid at the time agreed, nor till after Cross had himself conveyed to the plaintiff and others, and obtained notes and money to pay over to Montague, who then, and not till then, delivered to Cross the several conveyances of one tenth each, which had been signed by the trustees, and which conveyances they did not mean should have any effect till payment and delivery. This was as fully known to Cross as to themselves. It is equally difficult to see, how such an inchoate and imperfect claim to have the land in a certain event, which had not then happened, and did not happen at the time agreed, nor till after he had made the very sale, now in controversy, could, in common parlance, be regarded as making him the owner or purchaser till that event. Much less can it be regarded so in the sense, and for the purpose and effect manifestly intended in making those representations here, and as they were probably understood by others, who re-

lied upon them. The impression undoubtedly made was, that the land was of such clear and high worth from its great amount of timber and other circumstances, as to be sold over again, by those purchasing from himself, and even to one, so well acquainted with it as a former owner was presumed to be, and at an advanced price on the advanced price which he had before obtained for it, and that owner also a man of great responsibility and wealth willing to be risked in this way.

But if the naked truth had been developed at the sale, that the money had not been paid to Cross by the First Boston Company, for the enhanced price then given by them, if it has been to this day, except in part; that Cross himself was one of the purchasers in interest from himself at that enhanced price, to the extent of one tenth of the township; that the next purchase back by him at a still further enhanced price had never been completed, nor a dollar of money paid for it, nor any likely to be, until he could accomplish another sale of the land, and thus raise the means; that this had been attempted with a second Boston company, a part of whom were also members of the first one, buying from themselves at an advance, but never paying any thing, from a conviction among some at least, that the pine timber on the land had been greatly overrated; looking at all this, can any person suppose that the purchase back, represented by Cross to have taken place to himself, accorded, as understood by the grantees in Long Island, or was meant to accord with the whole truth? or that it was supposed by him to be understood by the plaintiff, and other grantees, in conformity with what he knew to be the truth in relation to what had happened as to that repurchase? And can any one for a moment believe, that the real facts as to it, if all disclosed, would have made the same impression on them, or held out the same inducements to buy as the representations did, which Cross then actually made? I think not. But when you add to this the further representation by Cross, that he had purchased this land back from a conviction of its superior qualities, there can be little doubt of the influence he meant to produce by the whole statement, and that it was at variance with the real gist of the whole transaction.

There was still another matter, connected with the land and the sale, which appears to have been stated by Cross in a manner not according with the facts as proved by various witnesses. The value of all the timber on the land depended much on the facilities, and speed, and certainty of getting it to a market. Cross represented that it could be sent to market, yearly, by a stream running through a portion of the township, while in truth it cannot be so sent, usually, short of two or more years; and he thus impressed on the plaintiff and others a belief of a fact,

which would naturally lead to a great overestimate of the value of what timber did exist on the land, independent of the other impression he attempted to make, of a quantity of pine timber being there so greatly beyond the truth as since developed, and as before referred to. But, besides these departures from what was open, upright and truthful in the transaction, certain other measures were resorted to with a view to produce the sale, which were reprehensible, and tended to suppress the real character of the transaction. In such cases there is little if any difference between suppressio veri and suggestio falsi.

Thus the whole matter as to the Second Boston Company, whose agent it is now said by some of the defendants he was, and whose bond of August, 1835, he carried to New York in his pocket, and who in that bond state they had purchased this township of him, when they had not, but whose failure to purchase and pay took place in October, and were well known to him in November, as well as the cause of it, in the deficiency of timber on the land, which had been assigned to him by some of them,—I say, the whole of this seems from the evidence to have been carefully concealed or suppressed, and did not become known to some of the grantees, if to any of them, before the ensuing spring. Had it all been made known before the sale, it cannot be doubted that its influence would have been decisive to prevent the sale, and could hardly have been overcome except through another concealment which existed in the case, and which is among the most censurable of the whole, and was at the start resorted to by Cross, and must throughout the whole of it have naturally exercised a controlling influence over the minds of the plaintiff and others. This was the employment of Chalmers, residing in New York, and a former partner of Cross, and an acquaintance of the grantees, as a secret agent of Cross, to promote the sale, on high commissions for the service, while Chalmers was to hold himself out to the grantees as a friend of theirs in the trade, a counsellor, and a purchaser of several shares in common with them.

The proof of all this, though denied by Cross in part, is satisfactorily made out by Chalmers' own testimony and various corroborating facts. If Chalmers, thus conducting, stood alone to disprove the answer of Cross, thus conducting, the rules of evidence might require us to hesitate as to the proof of this charge being sufficient, unless believing Cross to be otherwise much more discredited by the contradictions to many of the allegations in his answer than Chalmers is. But, beside such a consideration, Cross admits some circumstances which go to support Chalmers. Cross admits he had been his former partner, and Cross was thus likely to use his services, and was not so likely to mislead him, as a stranger, in making a sale

to him. Cross needed the services of some one to make him acquainted with the New York grantees, and he admits that certain notes were executed between them, which Chalmers avers to have been part of this corrupt transaction. Cross admits, that he abated $1000 on one note as a compromise of "Chalmers' claim," and "to pacify him." Nor does he deny the averment in the bill, that Chalmers signed an obligation to take two thirtieths of the township at nine dollars per acre, to be afterwards shown to the Long Island purchasers. He also made Chalmers the correspondent in relation to this sale during his absence; and letters of Chalmers put into the case, written to some of the purchasers, as well as to Cross, pending the negotiation, are of a character to indicate the double capacity in which he was acting, or rather show much more of the agent for Cross, than the ordinary purchaser. One of them, written a few days after the sale, and addressed to E. Wyer, another former partner of Cross, recommends the responsibility of the signers of the notes, and shows Chalmers still continuing to act in aid of Cross and his interests. The evidence of Miller and others proves, likewise, Chalmers' efforts to smooth over any difficulties in the way of the sale, which were much more in conformity with his agency for Cross, than with his action merely as a common buyer with the rest from Cross. The influence which Chalmers, thus situated, could and did exercise, would be sinister, and almost impossible to thwart or resist. While confiding in him as their friend and copartner in interest, even affixing his name to and heading the written subscription to take shares, and expressing solicitude as to the purchase, and actually receiving conveyances as if a bona fide purchaser from Cross, they in reality were cherishing in him, the hired agent of Cross, with a deep interest, to tempt them to purchase, though ruinously, and himself taking really no share in the purchase, except as in payment for his fraudulent services.

The notes given to Cross were, as Chalmers states, but a cover to blind the eyes of all concerned, in Boston and New York, with counter notes given by Cross to him, to be subsequently exchanged or arranged so as to exonerate Chalmers from any other payment than his commissions as agent. Had the grantees known Chalmers' position, it cannot be supposed, for a moment, that the trade would probably have been consummated. Connected with this, and the diminished confidence to me placed in Cross's statements when to the contrary, and connected with his general behavior as to fairness throughout the whole business, is the change in his answers and oaths respecting the form of the written contract with Noble. The lame account also given of his exaggerations concerning the amount of his property; his apparent tampering with some of the certifiers and persons living near the land; his conceal-

ments as to the Second Boston Company, and of the disclosures made to him by Cordis; his antedating all the writings in November; his antedating the paper signed by Gregg; his having certificates addressed double, as if made either at his request or Babcock's; his failure to produce the Reed bond; his claim at one time to have Noble retain property to pay it, and then avoiding it when sued; his pretensions to be immensely rich in 1835, and yet, in that very year, allowing himself to be prosecuted, defaulted, and no payment made, and assigning most of his estate to other creditors; his assumed ability to fulfil all his extravagant guarantees, and yet going into hopeless bankruptcy; his avowed loss of the written contract made with Noble, but preserving one not made; the looseness evinced in his deposition respecting his various debts, and the securities for them, lodged with Noble, and not accounted for in his bankrupt schedule; and, finally, his eagerness to sell what he stipulates and guarantees shall yield a profit of $1,296,000, thus throwing away at once that immense profit! —from all these, and from the considerations before explained, I regret that it is impossible to divest my mind of the conviction, that the conduct of Cross, in this transaction, has been such as to render his answer entitled to diminished confidence, and the sale to the plaintiff void on account of material misrepresentations, which could not but have influenced the plaintiff to make the trade, and which have turned out to be unsupported by facts. Nor do I entertain much doubt, that the bill, in this case, alleges enough to justify setting aside the sale on account of a gross and great mistake in the quantity of pine timber on the land; there being clear evidence not only of that mistake, but that the quantity of such timber formed a principal inducement to the purchase by the plaintiff and others.

But there is no substantive, distinct claim in this bill to set the sale aside for a mistake alone; and though all the averments necessary to recover for a mistake may be included in the higher charges of fraud, and there are some analogies to justify the waiver of what is surplusage in cases at common law, such as finding a prisoner guilty of manslaughter under an indictment for murder, and of larceny under one for burglary; yet it is not certain that the respondents, under this bill, would come fully prepared to make such answers and proof as they would make, in case of a bill asking specifically to have the sale set aside for a mistake. The case of Daniel v. Mitchell [Case No. 3,562] seems to sustain such a course; but the printed report of it does not set out the bill so fully as to enable one to judge, with certainty, whether it is a precedent in point or not on this question. The manuscript bill, however, on being examined by me, is found to declare the representations there made not to be true. It uses the words " 'knowingly' and 'wilfully' misled

the explorers, with intent to deceive them;" that, relying on them, they purchased as if true; that, in fact, the land did not contain so much timber, nor of such quality, nor were the certifiers honest or acquainted with business; that the respondents knew so; and that the plaintiff had not seen the true tract of land, and the defendants combined to deceive him, &c. &c. The words "fraud" or "mistake," ipsissima verba, are not used, though the bill seems to rely chiefly on the former. But if the doubts first expressed on this subject are somewhat shaken by this state of the record, in Daniel v. Mitchell [supra], it is manifest that Tuthill, one of the purchasers, had some means of knowledge to correct mistakes; and that, through him, some opportunities for information were enjoyed by all the parties, which possibly might prevent them from setting the contract aside for a mistake alone, if no falsehood or fraud were employed to prevent the full and fair use of those means, and to make the parties enter into the trade, partly on account of other circumstances, tainted by such falsehoods.

I have therefore turned my attention to the matter of falsehood and fraud, as perhaps necessary, and have inquired what misrepresentations were made, which were material in the trade, rather than looking to mere mistakes; and am convinced that falsehood and fraud were practised in all the means used by Tuthill, so far as those means are proved to have come to the knowledge of Smith, the plaintiff; and in that mode, as well as directly, they extended to other essential elements in the trade, so as entirely to destroy its validity in respect to the respondent, Cross. More especially is this the case as to many details, where the purchaser, confiding in the representations and guarantees of Cross, who claimed to be a man of great wealth, would be less particular, and surely would be far less so as to matters laying more within Cross's private knowledge. Mason v. Crosby [Case No. 9,234]. As to these, still trusting to him, they would look only to general appearances and general considerations. There is, to be sure, much in extenuation as to Cross, that shows him to have been, in such an insane era as 1835, in many respects duped as well as duping; and after conforming heedlessly to a false standard of the times, acting, without doubt, from recklessness and want of sober reflection, in respect to his statements, more than with a view wilfully to misrepresent and defraud. One striking illustration of this existed in his presumption to guarantee that the land, even at the high price it was sold for, should yield over a million of dollars in profits. Nor is there any solution of this, independent of extreme credulity and inconsiderate folly, except what is worse, a conviction that he was worth nothing, and hence was risking nothing, though professing to be so wealthy. His tempera-

ment seems to have been sanguine, and his operations hasty; and hence he perhaps often believed what others, even in that credulous epoch, distrusted. But it is to be remembered, that in all these cases, the court is bound to look only to civil obligations and duties. It is not necessary, except in criminal prosecutions, to find that the mind was evilly disposed, or knowingly deceiving under an entire loss of its moral tone. But it is enough if statements were made, whether with or without knowledge, which were material to the trade and were relied on, and which turn out to have been clearly unfounded. He, who hazards such statements, should be made to suffer from them civiliter, rather than those whom he misleads by them; the author of them should suffer rather than their victims. According, then, to this respondent, all which charity and the facts may justify, he must still be answerable to the plaintiff for all the money and notes he obtained from him. What aid he ought to receive from the other parties to the bill in meeting this liability, and on what terms or conveyances back by the plaintiff, will be seen after examining the rest of the case

The next inquiry is, how does the case stand in respect to the other defendants, who were members of the First Boston Company? They were owners, as cestui que trusts of certain shares in common and undivided with Cross. Besides this, they had recently bought the land of him, and united with him in making a new survey of the timber on it; and some of them had visited the premises in company with him. He held a large amount still due from them in notes; and in a few weeks, if not days, after taking them, during the very next month, entered into a negotiation with Babcock and Glover, the trustees authorized to sell and manage the land, to repurchase it from them at the advanced price of five dollars per acre, when they had given only $3.50. This was done, either because he believed, after so short a time, that he had parted with it much below its real value, though at nearly treble the price he had agreed to pay Reed for it, which belief would be not a little extraordinary; or from a conviction, which he had impressed on the minds of the trustees of the company, that although not able to pay them so large a sum as the advanced price would amount to, even after deducting their own notes to him, he could in a short time accomplish it, if they would give him a bond for a deed by the 19th of October ensuing; and, in the mean time, would co-operate with him in effecting a sale to a second company in Boston at a still further advance, and then enable him to make still another sale at a still further advance for the second company in New York or elsewhere. The whole seems to have been parts of one plan; that plan or arrangement was to effect a sale by and payment to the own-

ers at an advanced price, and for profit to them as well as Cross. It was a leading object to secure payment no less than a sale, in order to discharge their notes to Cross as well as realize large gains soon, and, taking this idea with us, many of the apparent discrepancies will be reconciled. They doubted Cross's responsibility, as has been already shown, and were under heavy liabilities for the considerations, which they must have been anxious to provide for and seasonably meet. To accomplish this arrangement or object through Cross, it was indispensable that he should have the aid of his associates in the First Boston Company, in order to obtain and to give titles, and to make them in a satisfactory degree sure, as to being paid such a large consideration as they were to receive, or even the smaller, but still large one, they were already liable to pay to him. That this was not intended as an actual sale to him, it appears that they did not, with all Cross's exaggerated wealth, seem willing to trust him with a deed, and take his note for the balance beyond what they owed him.

It is a very decisive fact, to show it was not meant as a sale to Cross, that they did not execute to him a deed at once, and after taking up their own notes, receive for the balance a mortgage from him on the whole premises, in order to secure it, and which they could not doubt, after just giving three dollars and a half per acre for the land, would make them entirely safe. Nor could Cross object to this, if the sale was bona fide, though at a price so much beyond what he had just sold it for; because in this way he would secure the first notes that run to himself, and all the consideration for his original sale to them, and only be liable to pay, beside, what he had become convinced was the increased value of the township. Nor would its being incumbered by a mortgage be any bar to his subsequent sale on his own account at an expected price still higher, as the mortgagees would discharge it on receiving a due portion of the consideration, and a good title could then be made by him, and the balance would be his own regular gains. But not doing this, and resorting to the form of a bond on the 15th of August, to convey to him on his making payment by the 19th of October, and receiving back a bond from him to make the payment, is much more reconcilable with the idea, that the sale was either conditional and to depend on his success in other sales by their aid; or was rather, and as is most likely in the usages of that day, regarded merely as one mode of enabling Cross, as their agent or attorney, to get more confidence as an apparent buyer. He might thus be able to make an absolute sale, if he could, for them, before the 19th of October, and then, on letting them have the money and securities to the amount of five dollars per acre, convey a title, and retain the residue of the consideration for his

services and gains. In the usages as to land sales in Maine, in 1835 and 1836, the agent was frequently clothed with papers as an actual or expected purchaser, though in truth a mere agent. Because his statements as one, who had himself ventured to buy, and was more responsible as an owner, would be more confided in than those of only an agent. Doggett v. Emerson [Case No. 3,960]. At first the "bonds," so called, were not sealed, but were mere written slips, agreeing to give a refusal a certain length of time at a certain price. But others were soon drawn by lawyers in common form. They appeared in that form more like real sales, and hence misled more in getting credit as owners, and at last that form was generally adopted. Cross also would be perfectly willing to enter into such an arrangement, if confident he could sell the land with the company's co-operation at a higher price, as he would thus obtain not only the excess, but the payment of his notes held against the company for his sale to them, and great profits on his one tenth still owned in the township. This direct interest of his seems, before the proceedings were closed in November, to have increased to two tenths, if not more, thus making him a larger owner in the first company, and hence more likely to be employed as its agent; and though an agent, this large private interest accounts also for the circumstance of his being willing to indorse the notes he procured to the company, having it also in his own power to take only good ones, and to secure them, as he did in this instance, by mortgages, which he seems afterwards to have proceeded to foreclose with dexterous speed. What appears to have next been done, in order to render this arrangement successful? The first company engaged to unite with other signers, to form a second Boston company to purchase the township of Cross forthwith, at even a dollar in advance on an acre, or over $28,000 advance in the aggregate on the price they had just agreed to sell it for to Cross. It is proved that they agreed, as a company, to take something like one third of the new shares, divided into thirty instead of ten, as in the first company, and three of the old members actually headed a subscription for seven shares in the new company. How can this be accounted for, if the sale to Cross had been absolute or bona fide, and not a mere mode of enabling the first company to effect in that way to others, if possible, an absolute sale, in order that they might realize five dollars an acre from Cross, for what they had just before engaged to pay to him only three and a half?

If they really wished to remain interested in the land, why sell to Cross any but the portions which they did not wish to retain? And why, if so wishing, agree to pay a dollar per acre more than they were getting from him for the very same premises? If the old company did not still remain owners,

and Cross their agent, why not pay Cross the one third they agreed to take in the second company, and convey to him to that amount in the township, under their contracted sale to him? And why in the end, in November, did they not take the balance of the township back from Cross, or retain it, and pay the enhanced price as agreed? But considering him in both these arrangements as their agent and a large part owner, and thus acting for them, rather than for himself alone, and these last acts become consistent and are left unfinished, as would be natural, while, on any other hypothesis, they are inexplicable. So if this subscription was not intended to be a real bona fide transaction, a sale and repurchase on the part of the first company, to this extent and in this way, but only a cover, to induce others to buy into the township at an enhanced price througn Cross their agent, though apparently to be a grantee, calling himself the actual purchaser from them, and being called by the new company their vendor, it is then reconcilable throughout. But without this hypothesis it cannot be. Thus reconciled, it is manifest the whole transaction operated deceptively, and was calculated to inflame the minds of new subscribers or purchasers with high hopes of still greater gains, seeing this township pass so rapidly through the hands of so many buyers, and each sale at a price constantly increasing. In order to heighten the delusion still more, in this writing of the Second Boston Company, which is produced and signed by the members, it is not only stated that they had bought the land of Cross at six dollars per acre, and the statement is headed by three of the old members, but that Cross was to be their agent to effect another sale at seven dollars and a half; taking to himself for his services the excess he might get beyond that, and paying himself out of it also the six dollars per acre they had engaged to give him. There is some evidence of other papers having been signed in connection with this, and certain guarantees having been made by Cross on them as to the quantity of timber on the land, in order to induce some of the subscribers to enter into this arrangement. But there being no deed produced from the first company, at that time to Cross, and none from Cross to the second company, and no proof of any notes being executed to him by any of its members for the consideration, or any bonds given to take any portion of the land, except in two or three instances; the whole real interest and title still continued in the first company, and Cross seems in reality, and throughout, to have been merely their agent, in order, if possible, to accomplish a sale, which would enable them to realize their expected five dollars per acre, and thus be able to pay Cross for the original purchase of him, as well as realize large profits, before they would convey a title to any one. The representation of an actual sale to Cross by the first company, made by him and some of the other members, when they never had executed a conveyance to him, and never agreed to, except on a condition, which he had not performed, and did not perform seasonably; and when they were very careful never to make such a conveyance, till he had sold and obtained the means, and delivered them over to their agent, to pay them for the land; was pretty obviously a representation made, not because such a sale had been perfected, or was meant to be, till they were paid, but because, in that way, he might obtain more confidence for his statements in selling, and might sell or profess to sell to another company, which they could aid in getting up, in order to have the means raised to pay themselves, by that other company, or by some subsequent persons, thus induced the more readily to buy of the second company under Cross's agency. Without such a professed sale by them to Cross, it would have been too barefaced to join in a company to buy again of themselves rather than of him. But amidst the whole of this complicated machinery, and unusual as complicated, except in times like those of 1835, no actual conveyance was ever made by the trustees of the first company, until the sale was completed to the plaintiff and his associates; and not a dollar of money appears to have been paid to them for any proposed or actual sale, till that now in question. The second company do not, in fact, appear ever to have received any deed either from Cross or the first company; and after the failure of the second company (October 17) to go on, Cross could act for nobody except himself or the first company; and as he had no deed from them, then or previously, he must, of course, in law, have been acting for them or nobody. Indeed, so much were they, from the start, using Cross as a mere instrument to accomplish a sale in their behalf, that some of their members aided him in the surveys of the timber; some united in the Second Boston Company to buy or profess to buy from him; some joined in puffing the lands to the New Hampshire purchasers, as if still deeply interested; some accompanied him to Long Island, where the sale was to be completed; and some received there the consideration, as well as delivered there the deeds.

It is difficult, then, to resist the conclusion, that, however, in form they may have given Cross a bond, to convey to him on condition, and however they did in form convey to him in the end, after he had made the bargain with and given a deed to the plaintiff; the whole was but a mode of making a sale by them, through him, as a part owner and agent. He was to fix the terms within certain limits, negotiate the times of payment and amounts, and they then, and not till then, were to receive the consideration and deliver a deed, to and through him, for the purchasers. That this was the real nature of the transaction, several circumstances, be-

side those already specified, tend to confirm. They are such as the decline in value, which, for some months, had been going on in that kind of property; such as the refusal of most of the Second Boston Company to buy, and some of them on account of the quantity of timber having been over-stated by Cross; such as Cross's inability to pay them, and take a deed on the 19th of October; such as the acquaintance of Cross with this kind of business, and his supposed usefulness as an agent to aid them; and such as his being almost in form, as well as substance, the agent of the second company also. If all this shows that the first company had never sold, and never meant to let Cross or others have the land till they were well secured for the consideration, these various negotiations were virtually made to enable them to get their price paid or well secured, and then, and not till then, to part with the title. In accomplishing this, whether Cross acted as part owner, and thus largely interested to succeed, or as agent, or as both, is not very material, as, in point of law, the acts were, in a great measure, for all the owners, for their benefit, to complete their sale, and secure to them their price. They could not, as Mr. Justice Story said in substance, in Doggett v. Emerson [supra], take the benefit of these negotiations, and some of them join in them, without taking the burthen. If they adopt one part of the res gestæ, they must the whole. They cannot repudiate a part, and yet derive all the advantages from it. If one claims under an agent, he must take the case cum onere, with his knowledge and acts. Hovey v. Blanchard, 13 N. H. 149. If Cross proved an unfaithful agent or associate, it should be their misfortune and loss, rather than those of strangers. A principal is answerable for the deceit of his factor civiliter, though not criminaliter, because, as somebody must lose, it is better to be him who employs one dishonest, than him who is defrauded. Bull. N. P. 31, b; 1 Salk. 289. And it is of no consequence, whether they specially and beforehand empowered Glover and Babcock, the trustees, to appoint Cross as the agent of the owners or not, if they ratified his doings, and thus adopted them, and strove to profit by them. See Doggett v. Emerson [supra]. The whole sale is to be set aside, then, as void for fraud.

The measure of the liability of each of the respondents in this class will be the amount each was entitled to receive, and did receive from Cross and the trustees, which was paid by the plaintiff, and any notes of the plaintiff either may have received from Cross towards his share. When a master has reported on this, the final decree can be made up to correspond with the report of the master. If any of the respondents be dead since the pleadings closed, a scire facias can issue against his executor, to show cause why judgment should not be entered, to that extent, against his goods and effects. To this extent they will come, in aid of Cross's general liability.

The last inquiry is in respect to the liability of Noble. He is the holder of some of the notes, taken for this sale to Smith, and if he took them before due and in the usual course of business, as an absolute purchase of them for a present or past consideration, and without notice of any fraud by Cross in the procurement of them, or any want of an adequate consideration to the makers, he is a bona fide purchaser, and cannot be required to surrender them till paid. But, on the contrary, if it is satisfactorily shown, that he knew what was the consideration for them, and that it was either fraudulent or of little value, or if he took them without such knowledge and notice, yet not as a purchase in the usual course of business, whether for a new or past consideration, but rather as a pledge to secure existing liabilities; and, much more, if he took them to secure future liabilities, the notes are open to any defence they would be if still continuing in Cross's hands. Among those defences is fraud, or want of adequate consideration, or a set-off against the promisee. Without regard to notice of fraud, or of enough to cast a shade on their consideration, the first and best test on this subject strikes me as being, whether there was an absolute sale of the notes? Was there any residuary interest left in the vendor, the indorser? Any equity of redemption? Any right to have a return of them on the payment of money or performance of some act? If so, it was not within the principle of protection to negotiable paper in the market, as that principle is to protect a purchaser, and not a mortgagee, who takes the notes as security only for other matters, instead of buying them in market overt as negotiable paper. He thus holds them merely as he would unnegotiable paper, or personal property pledged for a like purpose; as some personal property and even land were pledged in this case to Noble. In such an event, he does not hold them for an agreed price paid outright for the notes, or credited for them on a former debt at the time of receiving them instead of when collected; nor as other property bought and not lodged merely as security. The destruction or loss, or failure in any way of this last property would fall on the assignor, while of the former it would fall on the assignee or buyer.

These seem the natural and truest tests of such transactions, rather than the fact of the consideration being new or pre-existing. 10 N. H. 266; Williams v. Little, 11 N. H. 66; 20 Johns. 637; 6 Hill, 93; [Swift v. Tyson] 16 Pet. [41 U. S.] 1; [Coolidge v. Payson] 2 Wheat. [15 U. S.] 66; [Townsley v. Sumrall] 2 Pet. [27 U. S.] 170; 4 Hill, 93; McNiel v. Holbrook, 12 Pet. [37 U. S.] 84. A pre-existing debt is a good consideration for the sale of a note when it is sold actually, or taken in actual payment. But, whether the consideration be one or the other of these, new or pre-existing, seems of little consequence, except as one species of evidence in relation to the fact of

the transfer being absolute or merely conditional. It is more likely to be conditional, when the debt is pre-existing, being more often then taken only to secure the debt; whereas when a new consideration is given, it is generally to make a purchase, and the transfer is more likely to be absolute. Yet, in either event, there may be other and much more decisive evidence than the oldness or. newness of the consideration as to the transfer being absolute or otherwise, such as a written acknowledgment that it was a pledge or a promise to account for the balance after collected, or no receipt being given of payment of the old or new consideration. While these would satisfy most persons of the fact, that the property or notes were pledged merely, the reverse of them would prove that there was an absolute sale. And the character of the sale or the transfer, whether absolute or conditional, and not the consideration only, must show, in my apprehension, whether the interest has been all parted with or not, and whether it is all to be shielded or not in the hands of a purchaser of commercial paper, in the usual manner and in the usual course of business, in disposing of such paper. If the general as well as residuary interest in the notes has never been parted with, but any loss of them, or any loss in their collection, is to fall on the assignor, and not the assignee, then the transfer is not absolute, and is not entitled to protection as negotiated paper, sold outright in the usual course of business.

Now there can be no doubt, that Noble took the notes and other property of Cross in October, 1835, as collateral· security for certain debts belonging to him and his partner, Wyer, and liabilities for which Cross was responsible, and that he was to apply their proceeds in discharge of those debts and liabilities, and return any balance to Cross. A similar account is given of the transaction by Noble, in his answer in Tuthill's Case, even after the alleged discovery of the mistake in the authenticity of document C, as to his agreement with Cross. But whether the property so assigned, was to be held as security for any new and future liabilities by them, on account of Cross, during the ensuing four years, is a matter about which there is much controversy, and is in the former view, as to the character of the transfer, not very material. So it is equally certain, that when the present notes were handed to Noble by Cross, in November following, it was done under a like arrangement as to their being security for the former debts and liabilities, and any balance was to be accounted for as with the others. But the same doubt exists, whether they were intended to cover any future liabilities or debts between the parties, and an additional doubt, whether any new responsibilities, before not included and not assumed, were to be covered by the pledge of these last notes. It is also quite clear, that some of the former notes, to the amount of about $4,800, were given up, when these last, amounting to about $29,000, were lodged with Noble in November. I speak of what is clear, as contradistinguished from what is controverted, because the writing itself, given by Noble to Cross, October 22, 1835, whether in the form as now contended by them, or as they originally, in the pleadings in this case, set it up to be in respect to future debts and liabilities, is conceded on all hands to have been an obligation to account for the proceeds with Cross, and pay over to him any balance.

Such is its language, as to this, under either view; such the averments in the answers, as well as the bill; and such the nature of the transaction. Neither the real, nor personal estate, nor notes were appraised at certain sums, and sold, or pretended to be sold, and Cross discharged or released from debts to that amount. The same remarks are applicable to the pledge of the last notes, except that some of the former ones were given up then; and there is some contest, whether some new debts or liabilities were not also to be covered by these. Giving those up is likewise another evidence that they had not been purchased outright. It will be seen, that, under these circumstances and views, it becomes unnecessary to settle the much controverted question, whether the writing given back by Noble to Cross covered any liabilities not existing at the time; and whether its operation would then be different in respect to this case, however it might be as to subsequent attaching creditors of the property. For, in either event, it is in other respects on its face, and as proved by the nature of the whole transaction, and as admitted in Noble's and Cross's answer, decisive that the notes were not sold absolutely, but only lodged as collateral security; the proceeds to be accounted for afterwards, and any balance to be paid over to Cross, and no past nor present consideration having been discharged or released at the time between the parties, and no fixed sum having been agreed on, for which the notes were sold or bought. Indeed, Noble admits, that no specific value was fixed or computed by him as to the property or notes originally assigned, so little did he think of making a purchase of them.

Again, it is unnecessary to settle another moot point, whether when the new notes, including that in this case, were pledged, Noble assumed any new liabilities or not. For if he did, they were only for the amount of a part of the notes; and of those formerly pledged, a part were given up, and the whole left were held as the others had been, only for security for what was due at the time they were pledged, whether consisting of old or new matter. It was no more an absolute sale for one set than the other; and they both were understood to be held in pledge the same way and to the like extent, and on like terms, though they might be in.

pledge for some new as well as old responsibilities. This renders it not necessary to decide still another point much discussed, which is, whether these notes, being made in New York, and to be paid there, must not be governed by the New York laws, as expounded by the decisions in the New York tribunals. It is conceded, that they must be in such a case, if local statutes existed there, changing the law merchant. Towne v. Smith [Case No. 14,115]; 2 Kent. Comm. 459; Story, Confl. Laws, 261, 262; [Bank of Washington v. Triplett] 1 Pet. [26 U. S.] 25; 9 Barn. & C. 209; 1 Adol. & E. (N. S.) 43; 12 N. H. 520; 3 Mass. 77. This is a different question, where there is no such statute, from what it would be to decide in a suit in this court on a contract, made elsewhere than in New York, or to be performed elsewhere, whether one of the parties belonging there, or even the suit being brought there, the judges of the United States would feel obliged, as a matter of course, to conform to the New York decisions on a general commercial question. I think it is clear they would not. Swift v. Tyson, 16 Pet. [41 U. S.] 2, holds, that state decisions on commercial paper do not bind us, except when on state statutes and peculiar local laws,—[The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175,—and these last bind, though on commercial paper. But the question here is, whether, in considering a contract, the lex loci contractus is not to govern the construction of that particular contract, when the law on it is the law expounded and settled in their courts, as much as that is the law which is there expounded on their statutes. I give no opinion on this.

There is so much in this long and complicated case, which it is necessary to decide, in order to dispose of it properly among so many parties, and such conflicting interests, that I am inclined not to agitate and decide either facts or points of law which arise, unless their decision seems to be, in some degree, either necessary or expedient to a correct judgment of all the merits. But when it so seems, it is the duty of the court, however unpleasant to itself or the parties, to probe the truth to the bottom, and announce it fearlessly without regard to consequences. I am more inclined, also, to forbearance, whenever justifiable, if the questions involve imputations on character and moral turpitude, such as fraud and palpable misrepresentations, made with a view to deceive. For these reasons, I have offered an opinion on the character of Cross's conduct in this case, because obliged to do it in order to dispose of the merits justly; but I have not expressed any opinion on the evidence, implicating several of the First Boston Company in respect to representations, covering the quantity of timber on the township in dispute, and concerning Cross's title, and which have not been shown to be true. It is not necessary to a just disposal of the case, to pass on the character of their own acts, or those of some of them, whether fraudulent in design or not. Because, without that, I hold the members of that company, in law, responsible for the statements and conduct of Cross, as their agent, and a part-owner in selling the land. The sale was for their benefit, and the proceeds of it were received by them to the extent of their claim on Cross, and for whose statements and conduct, while so acting, they must, in a civil point of view, be liable, if they choose to take the benefit or fruits of his doings, whether intending themselves to have defrauded the purchasers or not.

In like manner, and for like reasons, I do not intend to express any opinion on the conduct of Noble, in respect to his books, some of it very remarkable, or on his various answers as to the paper C, containing what purports to be the contract between him and Cross, neither of them professing to preserve the true contract, but both preserving what was wrong, and losing what was right; or, on the looseness and imperfections of his exhibits and accounts, connected with this large transaction; or the variances of dates, sums, and positions, taken at different times; or on his knowledge of any thing false or fraudulent in the proceedings of Cross in selling this land to the plaintiff and others, so as to obtain the notes now in dispute for his own security; or on his collusion in any way or to any extent with Cross, either to defraud his creditors by the conveyances to Noble; or to defraud the plaintiff and others by having their notes forthwith negotiated to himself, so as to prevent defences to them, or the satisfaction of any judgments which might afterwards be recovered against Cross on guarantees, or warranties, or bonds. But in respect to the fact of notice to Noble, or knowledge by him, that these notes were part of a large consideration paid by the plaintiff and others, for township A., No. 2; and that the land was of little value in comparison with the price obtained, if it were necessary to decide, no great doubt can exist, looking to all the circumstances and proofs. It probably is not necessary to show, that Noble had such knowledge, if he held the notes merely as collateral security. 10 N. H. 226; 11 N. H. 66. But if this knowledge was necessary, it is well made out, and the facts involved were enough not only to excite inquiry, but to "cast a shade" over the notes themselves, and bring them so as to be open to this defence on other well settled principles. Chit. Bills, 281; Story, Bills & Prom. Notes, §§ 194, 197. The fact of his knowledge does not, as is argued, depend merely on the testimony of George Miller. If it did, the position of Miller, as one of the associate purchasers, and the attorney and adviser of the rest, would require a close scrutiny; and after all, it would be but the evidence of one person to overcome the denial of Noble in his answer. But it besides rests on the evidence

of Lord about Noble's conversation with him, disparaging the value of this township, on the evidence of Reed as to Noble's repeated inquiries of him concerning the timber, and Reed's opinions that the quantity was small; on the fact that Noble himself was a dealer in such lands and likely to know the value of lots owned by those so intimate with him as Cross, a former clerk, a present limited partner, a large debtor to him; on the fact, that Cross's bond to Reed for the price of this very tract, was signed by Wyer, another partner of Noble, and that property was assigned to Noble to secure Wyer for this liability, as well as others on account of Cross; on the further fact, that Noble was a witness to one of Cross's deeds of these premises, was a traveller or visitor near to them with Cross when about to explore them, was with him when Tuthill was negotiating at Portland for his purchase of a share in them, was in New York pending the negotiations there for them, was suspected of interfering there, and did there speak disparagingly of them, and actually is shown to have made inquiries about them, not only of former owners who considered its timber as small in quantity compared with the surveys, but an inquirer of others, such as Cordis, who had proposed to buy but refused, because the quantity of timber was believed to have been much exaggerated.

Now, after all those intimacies and confidences, and connections, that he should become the assignee of Cross to the large amount of $80,000 or $100,000 worth of property, and then take in addition to it near $30,000 more in notes, and not ask Cross the consideration of them; and that Cross, when so asked by such a friend and creditor and trustee, should have concealed from him that the notes were given for this land, and the price per acre; and that Noble did not know the purchasers must have given such a price, under the supposition that the quantity of timber was much larger than Noble knew to be probable; it is exceedingly difficult to believe. This conclusion is strengthened, moreover, by the testimony of Gregg, that Noble told him that Cross had frequently said to him he was agent of the Boston Company; showing that they were in the habit of conversing about the land and its sale. For reasons like these, and those first detailed, without going into the specific question of any fraud being known or intended by Noble, it seems to me equitable as well as legal, that he should be considered as holding the notes subject to any equities or defences, existing against Cross at the time of their indorsement by him. In holding this, if a loss must happen somewhere, it is more proper in justice, as well as law, that it fall on Cross, and those representing him, and holding the notes for him, and for his benefit as well as their own, rather than on those whom Cross had deceived and misled in order to obtain them. But, at the same time, though in this view it

seems right to require the notes of the plaintiff held by Noble to be surrendered, and it must be done, yet it is proper that Noble should have the same lien on what is to be re-conveyed to Cross or the First Boston Company, and what constituted the consideration for the notes, as on the notes themselves. Hence Cross's two or three tenths, as owned at the time he got these notes, should go in pledge to Noble till his claims are satisfied, rather than go to the general assets of Cross as a bankrupt, for the benefit of all his creditors, pro rata. The re-conveyance by the plaintiff might be made so as to do justice in two or three ways. But the most natural one is for it to run to Cross, on the plaintiff's receiving his money and notes, in trust for Noble to the extent of the shares owned by Cross at the time of the sale, and to be conveyed by Cross to Noble as collateral security after the notes of Smith are surrendered to him, and the residue held in trust for each of the First Boston Company, and to be conveyed to each, according to his shares in the land, after his making the payments of money directed by the decree in this case.

Let a master be appointed to ascertain and fix the sums of money to be paid by Cross, and refunded to, or in aid of, him, by each owner, and also to prepare the form of the conveyance to be executed by the plaintiff, and by Cross to the other parties; interest to be computed on all that has been paid by the plaintiff, from the times it was paid, and the usual deductions made for timber cut, or rents received by him.

During the argument of this case, and after the pleading and evidence were closed and printed without any reference to the bankruptcy of Cross, or any other of the respondents, it was moved that he might have leave to file and avail himself of a certificate of discharge as a bankrupt, which he had obtained since this bill was instituted. The motion was made in May, 1846. Afterwards it was found, that such a plea had been made by him and others, after the case was printed, but had been lost; a duplicate was allowed to be filed. Since that motion was made, this court, in the Maine district of this circuit, overruled a like motion, both for being made too late, and for being, as to a claim, not provable before a commission in bankruptcy. The grounds of this decision were fully explained in the opinion in that case, and may be seen in the concluding part of it. Doggett v. Emerson [Case No. 3,962]. Where others, or Cross himself, pleaded a discharge in bankruptcy at the next term after obtained, the objection as to improper delay might not apply, but the other objection as to the nature of the demand, being one merely in equity, and tainted by fraud, applies in full force to the whole of them. These pleas are, therefore, overruled.

It is stated, also, since the case has been

argued, that pleas in bankruptcy were filed for all the other respondents, except Noble, and Whitney & Haskell; some of them in A. D. 1843, and some in 1844. But they are not printed in the record book in this case, nor have they been argued, or any reply made to them. But this is of little importance, as from the views just expressed, they could not avail any of the parties, in respect to an equitable claim, like this, to rescind a contract pending in a court of equity, and growing out of fraudulent misrepresentation. The pleas in bankruptcy are, therefore, overruled.